IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 15-cv-01274-RBJ

In re: BRENDA A. OGDEN,

      No. 11-19841-EEB

PNC BANK N.A.,

      Appellant,

v.

BRENDA A. OGDEN,

      Appellee.

---

## ORDER

---

This matter is before the Court on PNC Bank N.A.'s (PNC) appeal from the judgment of the bankruptcy court, which awarded actual damages, punitive damages, and attorney's fees for PNC's violation of the automatic stay. This Court exercises jurisdiction over the appeal pursuant to 28 U.S.C. § 1334(a) and 28 U.S.C. § 158(a)(1). The Court has reviewed the record and the briefs of the parties. For the reasons set forth below, the bankruptcy court's judgment is affirmed.

## BACKGROUND

The Court finds that the following facts are supported by substantial evidence in the record, and that the factual findings of the bankruptcy judge referenced below are not clearly erroneous.

1

This appeal is rooted in a history of animosity between the two parties.  On January 14, 2002 Appellee Brenda A. Ogden secured a loan for her primary residence.  Appellant PNC services that loan.  ECF No. 7-1 at 10.  Ogden has initiated various lawsuits against PNC since 2002, "alleging erroneous charges applied to her loan and misapplication of her mortgage payments."  ECF No. 7-3 at 290.

On April 28, 2011 Ogden filed a voluntary petition for relief under Chapter 13 of the United States Bankruptcy Code.[1]  ECF No. 7-1 at 10.  Prior to her bankruptcy petition, she had missed seven mortgage payments.  *Id.*  PNC filed a proof of claim, which asserted that Ogden owed $10,497.39 before she filed for bankruptcy.  ECF No. 7-3 at 291.  This pre-petition debt included the seven missed payments, escrow advances from PNC, and other fees and costs.  *Id.* On March 12, 2012 the bankruptcy court confirmed Ogden's Chapter 13 plan, which detailed how she would cure her arrears and other charges while proceeding to pay her monthly mortgage payments.  *Id.*  Around the same time, Ogden also filed suit in federal district court, claiming that PNC violated the Real Estate Settlement Procedures Act and the Truth in Lending Act.  *Id.*  The parties settled in June 2012.[2]  *Id.*

---

[1] "Unlike debtors who file under Chapter 7 and must liquidate their nonexempt assets in order to pay creditors, see §§ 704(a)(1), Chapter 13 debtors are permitted to keep their property, but they must agree to a court-approved plan under which they pay creditors out of their future income, see §§ 1306(b), 1321, 1322(a)(1), 1328(a)."  *Hamilton v. Lanning*, 560 U.S. 505, 508 (2010).  A Chapter 13 bankruptcy petition "authorizes an individual with regular income to obtain a discharge after the successful completion of a payment plan approved by the bankruptcy court."  *U.S. v. Hale*, 762 F.3d 1214, 1216 (10th Cir. 2014) (internal citation omitted).

[2] The settlement dictated that PNC would reduce Ogden's principal balance by $12,500 and apply any excess payments to the principal.  ECF No. 7-3 at 291.  PNC was to reduce the principal by July 1, 2012, but it did not process the reduction until January 2013.  *Id.*  Ogden had to file suit in order to get PNC to comply with the terms of the settlement.  As Judge Brown notes, "[t]his history engendered distrust and a profound breakdown in communication between these parties."  *Id.*

When Ogden filed for bankruptcy, an automatic stay issued.  The stay prohibits PNC from continuing or initiating certain proceedings against Ogden during the pendency of her bankruptcy petition.  Despite the existence of the stay, PNC sent Ogden two letters (collectively "the Letters").  ECF No. 7-1 at 5–6.

The first letter, dated November 2, 2012 (the "November Letter"), informed Ogden that she was approved to enter "into a Trial Period Plan for a mortgage modification." *Id.* at 6.  The letter explained that the modification would offer Ogden "more affordable mortgage payments or more manageable terms." *Id.*  It then detailed the mortgage modification process, including a payment schedule for three payments she would need to make to complete the trial payment plan. *Id.*  Ogden did not sign up for the trial payment plan.  ECF No. 7-3 at 291.

Additionally, the November Letter made multiple references to foreclosure. *Id.*  The second paragraph is preceded by a bolded header stating "To Suspend Foreclosure."  ECF No. 7-1 at 6.  The letter stated, "[i]f you contact us or make payment by November 16, 2012 to indicate your intent to accept this offer, we will not refer your loan to foreclosure or if your loan has been referred to foreclosure, we will suspend foreclosure.  However, if you do not . . . foreclosure proceedings may continue." *Id.*  Other mentions of foreclosure appeared in later sections of the letter. *Id.* at 6–7.

In December 2012 Ogden asked PNC for an explanation of why it had offered her a significant decrease in her monthly payment in the November Letter.  ECF No. 7-3 at 292.  She also requested a history of her loan payments, a reinstatement quote, and a payoff quote. *Id.*  She did not receive a detailed response. *Id.*  Rather, PNC sent "form letters" with general proclamations that it was "researching her loan." *Id.*

On January 2, 2013 PNC sent Ogden the second letter (the "January Letter").  ECF No. 7-1 at 5.  This letter informed Ogden that the "review of [her] hardship assistance request ha[d] been completed," but that PNC could not approve her request for assistance.  *Id*.  The letter then referenced the November Letter's offer of a loan modification and stated, "[w]e did not receive your scheduled loan payments as outlined in the agreement."  *Id.*  It also stated, "[p]lease note that the servicing of your loan will continue per the terms of your Note and Mortgage, including foreclosure proceedings and normal credit bureau reporting.  If foreclosure activity was previously suspended on your loan, it has now resumed."  *Id*.

Shortly after Ogden received the January Letter, PNC sent her an "escrow analysis."  ECF No. 7-3 at 292.  The escrow analysis reflected an increase to her monthly payment.  *Id.*  PNC filed notice of this change pursuant to the requirements of Rule 3002.1 on January 26, 2013, and it attached the escrow analysis to the filing, but it gave no indication as to why it had increased her payments.  *Id*.

On January 29, 2013 Ogden filed for a proceeding before the bankruptcy court.  At that time, Ogden was "current on her post-petition obligations."  ECF No. 7-3 at 8.  The bankruptcy court subsequently held two trials on Ogden's claims that PNC "violated the automatic stay, the confirmation order, [Ogden's] chapter 13 plan, and Fed. R. Bankr. P. 3002.1."  *Id.* at 290.  The first trial (the Adversary Proceeding) focused on "[PNC's] accounting for payments received post-petition but before the completion of [Ogden's] plan."  *Id*.  Bankruptcy Judge Elizabeth E. Brown became aware of the Letters during the Adversary Proceeding.  *Id*.

During a deposition conducted in advance of the Adversary Proceeding, PNC provided a reinstatement quote to Ogden that was current as of August 15, 2013.  *Id.* at 292.  The

reinstatement quote reflected "additional post-petition fees and corporate advances in excess of $5,500." A PNC representative Dorothy Thomas testified regarding those additional charges at the Adversary Proceeding. Thomas stated that the reinstatement quote reflected the amount needed to bring the loan "contractually current."[3] *Id.* As Judge Brown summarized, this quote "essentially ignored the bankruptcy by providing numbers as if the Debtor was not curing the pre-petition arrears through her plan." *Id*.

During her testimony Thomas also attempted to explain why PNC sent the form letters. Essentially, PNC maintains two sets of books in accounting for Ogden's post-petition mortgage payments. The first is for the purpose of the bankruptcy proceedings, and the second is an accounting as if Ogden had never filed for bankruptcy. *Id.* For bankruptcy purposes, PNC applies each of Ogden's post-petition payments to the month and year in which she actually paid them. *Id.* In contrast, for non-bankruptcy purposes, PNC applies payments to the "oldest outstanding payment due in accordance with the Debtor's deed of trust." *Id.* at 292–93. Thomas explained that Ogden is current on her post-petition payments as she has made all of the payments scheduled through her bankruptcy plan. *Id.* at 293. However, PNC does not perceive her to be "contractually current" under the deed of trust as she has yet to pay off all of her pre-petition arrears.[4] *Id.*

---

[3] Thomas also attempted to justify the issuance of the reinstatement quote, claiming that it was not a final version because it was not printed on PNC's letterhead. She elaborated that PNC's legal counsel reviews anything that is printed on official letterhead to see if the quote included any non-collectable items like fees and corporate advances. ECF No. 7-3 at 292.

[4] PNC explains that it uses two forms of accounting because, unless the Debtor completes her bankruptcy plan, she will remain subject to all of the terms of her promissory note and deed of trust, including the accrual of late fees. Therefore, according to Thomas' testimony, if Ogden finishes her plan, PNC will "true up" the accounting of her loan, and it will appear like she had never defaulted on her pre-petition arrears. She will then be subject to the terms of her original promissory note and deed of trust. *Id.* at 293.

Following the Adversary Proceeding, the bankruptcy court issued an order on the accounting issue and admitted the January Letter into evidence. *Id.* at 290. Judge Brown entered judgment in Ogden's favor for the violation of the automatic stay based on the January Letter. She also awarded actual damages of $14,889.57 and punitive damages of $5,000. The bankruptcy court dismissed Ogden's remaining claims without prejudice. ECF No. 7-5 at 250. PNC moved for reconsideration, arguing that Ogden had not pled that the Letters violated the automatic stay in her Complaint. Judge Brown "in an abundance of caution" issued an amended order "which omitted any ruling on the letters and dismissed [Ogden's ] stay violation claims without prejudice." ECF No. 7-3 at 290. Despite issuing this order, Judge Brown noted that PNC did not demonstrate prejudice related to the omission in the complaint, that it had not made any objection to the evidence about the letters, and that it even cross examined Ogden about the letters. *Id.* On April 3, 2014 the bankruptcy court issued an order to show cause, requiring PNC to demonstrate why it should not be sanctioned for having sent the Letters to Ogden. *Id.* At the second trial (the Evidentiary Hearing), the parties did not introduce new testimony. Rather, they argued their respective sides and relied on additional exhibits and the transcript from the Adversary Proceeding. *Id.*

On June 1, 2015 Judge Brown issued an order finding that PNC had violated the automatic stay by sending the Letters to Ogden. Judge Brown entered judgment against PNC and awarded damages for emotional distress, attorney's fees, and punitive damages to Ogden. ECF No. 7-3 at 290–300. PNC filed its notice of appeal on June 15, 2015. ECF No. 14 at 8. The appeal became ripe upon the filing of Ogden's reply brief on October 12, 2015. It was reassigned to this Court the following day.

# ANALYSIS

## I.      Standard of Review.

The bankruptcy court's conclusions of law are reviewed de novo.  *In re Market Center East Retail Property*, 730 F.3d 1239, 1244 (10th Cir. 2013).  "Whether a party's actions have violated the automatic stay is a question of law[.]"  *In re Diviney*, 225 B.R. 762, 769 (BAP 10th Cir. 1998) (internal citation omitted).  As with all findings of fact, "[w]e review the bankruptcy court's finding that a creditor's action constituted a willful violation of the stay for clear error."  *Id.* (internal citations omitted).  "A factual finding is clearly erroneous when it is without factual support in the record, or if the appellate court, after reviewing all the evidence, is left with the definite and firm conviction that a mistake has been made."  *In re Scroggin*, 364 B.R. 772, 778 (BAP 10th Cir. 2007) (internal quotations and citations omitted).  "In reviewing findings of fact, we are compelled to give due regard to the opportunity of the bankruptcy court to judge the credibility of the witnesses."  *Id.* (citing Fed. R. Bankr. P. 8013).

"An award of sanctions for a violation of the automatic stay is reviewed for an abuse of discretion."  *Diviney*, 225 B.R. at 769 (internal citation omitted).  Under this standard, the "trial court's decision will not be disturbed unless the appellate court has a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances."  *McEwen v. City of Norman, Okl.*, 926 F.2d 1539, 1553–54 (10th Cir. 1991) (internal citation omitted).  "An abuse of discretion occurs when the [lower] court's decision is arbitrary, capricious, or whimsical, or results in a manifestly unreasonable judgment." (internal citation omitted).  *In re Corey*, 394 B.R. 519, 523 (BAP 10th Cir. 2008).  "A de novo

standard of review, however, applies when passing on a determination of the constitutionality of punitive damages awards." *In re Culley*, 2006 WL 2091199, at *2 (BAP 10th Cir. 2006) (unpublished) (internal citation omitted).

On appeal, "[t]he burden of proof is on the party seeking to reverse a bankruptcy court's holding." *In re Van Vleet*, 461 B.R. 62, 68 (D. Colo. 2010) (internal citation omitted). The appellant must demonstrate that the "court's holding was clearly erroneous as to its assessment of the facts or erroneous in its interpretation of the law, and not simply that another conclusion could have been reached." *Id.* (internal citation omitted).

## II.     PNC's Appeal.

PNC argues that the Letters did not violate the automatic stay. ECF No. 14 at 19. Alternatively, the bank attests that, even if the Letters were a violation, Judge Brown erred in awarding actual damages for emotional distress and attorney's fees. *Id.* at 20. PNC also claims that this Court should reduce or vacate the bankruptcy court's award of punitive damages. *Id.* at 21. Finally, PNC urges this Court to vacate Judge Brown's order because the doctrine of res judicata barred her consideration of the alleged stay violations. *Id.* The Court will address PNC's arguments in turn.

### A.  Automatic Stay – Generally.

Section 362 of the U.S. Bankruptcy Code "provides that all proceedings against a debtor are stayed upon the debtor's filing of a petition for bankruptcy." *Ingle v. Dryer*, 2007 WL 2071657, at *1 (D. Colo. 2007) (unpublished) (internal citation omitted). The stay applies to all chapters of the Bankruptcy Code, including Chapter 13. The automatic stay "stops all collection efforts, all harassment, and all foreclosure actions." *Fortier v. Dona Anna Plaza Partners*, 747

F.2d 1324, 1330 (10th Cir. 1984) (quoting S.Rep. No. 989, 95th Cong., 2d Sess. 54–55 (1978),

*reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5840–41).  The stay persists until a

discharge is granted or denied or the case is closed or dismissed.  § 362(c)(2).  Section 362(k)

provides for the recovery of actual damages for the injuries caused by willful violation of the

automatic stay.[5]

As soon as the stay is in place, creditors are prohibited from taking most actions against a

debtor without going through the bankruptcy court.  *In re Johnson*, 575 F.3d 1079, 1083 (10th

Cir. 2009) (internal citation omitted).  As is most relevant to this case, §362(a) prohibits:

> (1) the commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

> (5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title; and

> (6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title.

Section 362(a)(6) prohibits a creditor from attempting to collect on "pre-petition" debts, which

are those owed at the moment that the debtor files for bankruptcy.  *In re Myers*, 362 F.3d 667,

673 (10th Cir. 2004).  The legislative history confirms that Congress intended this specific

prohibition to offer broad protection to the debtor:

> Paragraph (6) prevents creditors from attempting in any way to collect a prepetition debt. Creditors in consumer cases occasionally telephone debtors to encourage repayment in spite of bankruptcy.  Inexperienced, frightened, or ill-counseled debtors may succumb to suggestions to repay notwithstanding their

---

[5] "Section 362(k)(1) was previously designated as subsection (h)."  *In re Johnson*, 501 F.3d 1163, 1169 n.4 (10th Cir. 2007).  I will use the amended designation.

bankruptcy. This provision prevents evasion of the purpose of the bankruptcy laws by sophisticated creditors.

S. REP. 95-989 at 50–51 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5836–37.

The scope of the automatic stay is expansive. *In re Sullivan,* 357 B.R. 847, 853 (Bankr. D. Colo. 2006). Courts construe the automatic stay broadly in favor of the debtor and apply exceptions under § 362(b) narrowly. However, as Judge Brown noted in a previous opinion, *In re McCarthy*, 421 B.R. 550, 565 (Bankr. D. Colo. 2009), the automatic stay does not outlaw all communications from a creditor to a debtor. *See also Pertuso v. Ford Motor Credit Co.*, 233 F.3d 417, 423 (6th Cir. 2000) ("[s]omething more than mere contact must be alleged in order to state a claim under § 362."). For example, the plain language of § 362(a) makes clear that the stay does not limit a creditor's actions regarding proceedings and claims that arise from "post-petition conduct." *See Leonard v. Fitzhugh*, Case No. 14–cv–2294–WJM–KLM, 2015 WL 3826712, at *5 (D. Colo. 2015) (unpublished) ("the Bankruptcy Code does not stay judicial proceedings that could not have been commenced prior to the bankruptcy petition, or proceedings to recover a claim against the debtor that did not arise before the commencement of the bankruptcy case."). "Determining whether a particular creditor communication violates the automatic stay depends on such specifics as what type of communication was sent to the debtor and whether the communication had a purpose other than collection of the debt outside the scheme contemplated by the Bankruptcy Code." *McCarthy*, 421 B.R. at 566 (internal quotations and citation omitted).

Courts consider whether the communication, and the context in which it occurred, created "threatening or coercive pressure on the debtor." *In re Schafer*, 315 B.R. 765, 773–74 (Bankr. D. Colo. 2004). "An action is coercive where it is tantamount to a threat or it places a debtor

'between a rock and a hard place.'" *In re Ammons*, 2012 WL 1252621, at *6 (Bankr. D.N.M. 2012). Courts examine a creditor's actions through an objective lens when analyzing whether the communications were "improperly coercive under the circumstances." *Id.* The automatic stay provides debtors with a "respite" from "the threat of *immediate action* by creditors, such as a foreclosure or a lawsuit." *Brown v. Pennsylvania State Employees Credit Union,* 851 F.2d 81, 86 (3d Cir.1988) (emphasis added). "Threats of foreclosure or repossession might justify a finding that a secured creditor has violated the automatic stay." *In Re Jamo*, 283 F.3d 392, 402 (1st Cir. 2002) (internal citations omitted).

### 1.   PNC's Sending of the Letters Violated the Stay.

Judge Brown concluded that "[n]o reasonable person would deny that [PNC's] November and January letters violated the automatic stay." ECF No. 7-3 at 294. She reasoned that the Letters contained threats of foreclosure, which qualify as acts "in furtherance of collection activity" in violation of § 362(a)(6). *Id.* at 295. After its de novo review of this legal issue, the Court affirms Judge Brown's conclusion that the Letters violated the automatic stay.

PNC argues that "there is no evidence to suggest" that the November Letter sought to collect on pre-petition debts. ECF No. 14 at 25. Rather, PNC claims that the November Letter offered Ogden a trial loan modification to reduce Ogden's future monthly payments "under a Fannie Mae initiative so that she could more easily afford her mortgage."[6] *Id.* at 24. PNC acknowledges that the November Letter did outline a payment schedule, but it argues that the

---

[6] PNC describes Fannie Mae's "Alt Mod 3.0 program" ("Alt Mod 3.0") as providing a debtor with a trial plan to "ensure that the borrower has the ability to make the modified payments going forward before permanently modifying the loan." ECF No. 14 at 24. These trial payments displace the regular monthly payments, but do not serve as repayment of past due arrearages. *Id.* at 25. As Judge Brown noted, Ogden did not request a modification and had just "effectively obtained one through the bankruptcy process." ECF No. 7-3 at 291.

three payments listed were future payments and not payments owed before Ogden's bankruptcy

petition.  *Id.* at 20.  PNC states that, "[t]he November Letter expressly provides that the trial

period plan modifies the ongoing (post-petition) monthly mortgage payments during the trial

period, and that the Debtor 'may make the trial period payment <u>instead of </u>the payment required

under [the] loan documents.'"  *Id.* at 25.  (emphasis in original) (quoting the November Letter).

Similarly, PNC argues that the January Letter did not seek to "collect on any pre-petition

arrearage."  *Id.* at 27.  PNC attests that it sent the January Letter "pursuant to Fannie Mae

guidelines, to inform Ms. Ogden that hardship assistance could not be approved or finalized

because she did not make the trial payments under the proposed trial payment plan that she

received [in the November Letter]."  ECF No. 7-1 at 9–10.  PNC construes the January Letter as

an advisement to Ogden that "servicing of the loan will continue in accordance with the loan's

terms and with applicable bankruptcy law."  ECF No. 14 at 28.

PNC's argument attempts to downplay the Letters' references to foreclosure by arguing

that neither letter indicated that Ogden must pay "a pre-petition debt to avoid foreclosure."  *Id.*

In support of this claim, PNC contends that courts have concluded that a creditor's discussion

with a debtor about a loan modification does not violate the automatic stay.  *Id.* at 26.  The Court

recognizes that the automatic stay does not categorically preclude creditors from negotiating with

debtors over a loan modification.  *See, e.g., In re Silva*, 2010 WL 605578, at *1 (Bankr. D.

Hawaii 2010) (the automatic stay does not "preclude loan modification negotiations between

debtors and secured creditors."); *In re Medina*, 2012 WL 2090419 at *1 (Bankr. M.D. Fla. 2012).

However, the Court disagrees with PNC's characterization of the Letters as innocuous attempts

to offer Ogden a loan modification.  The determination of whether creditor conduct violates the

stay is fact-specific, hinging on the particular context and content of the communication.  *See In Re Diamond*, 346 F.3d 224, 227–28 (1st Cir. 2003) (while settlement negotiations in discharge proceedings do not categorically violate the stay, statements made during such negotiations could be impermissibly coercive or threatening).  *See also McCarthy*, 421 B.R. at 565–66 (the negotiation of a reaffirmation agreement does not necessarily violate the stay, but a violation "may still exist if a creditor's actions are coercive or otherwise harassing in nature.").  PNC's communications about the possibility of a loan modification do not excuse its inclusion of other threatening, coercive, or harassing messages.

Neither of the Letters clarified that foreclosure did not actually appear on PNC's "agenda."  *See Brown,* 851 F.2d at 86 (analyzing the context surrounding the creditor's mentions of foreclosure and concluding that they signaled that foreclosure was not "on the [creditor's] agenda").  *See also Jamo*, 283 F.3d at 402 (the credit union's references to foreclosure made clear that it "was not on [its] agenda.").  Rather, the January Letter's stark statement that "foreclosure has resumed" clearly conveyed the message that, not only was the threat of foreclosure immediate, but that the bank had acted on the threat to foreclose.  Moreover, the November Letter contained misleading information regarding the possibility of foreclosure.  In contrast, where a credit union sent letters to debtors with multiple mentions of foreclosure, the First Circuit found that the references to foreclosure were "unarguably benign," and that the credit union "accurately delineated the debtors' foreclosure-related liability."  *Jamo,* 283 F.3d 392 at 402.  The November Letter's references to foreclosure were not so harmless, as they misrepresented Ogden's rights to her property.

PNC relies on *In Re Jennings*, 304 B.R. 8 (Bankr. D. Me. 2004) for the notion that not every threat violates the stay.  In *Jennings,* a town in Maine sent a notice to debtors demanding the payment of overdue property taxes.  304 B.R. at 9.  The letter instructed the debtors on how to pay the debt, and it also included this warning, "IMPORTANT: Do not disregard this notice. You will lose your property unless you pay your 2002 property taxes, interest and costs[.]"  *Id.* at 10.  The *Jennings* court found that the mailing of the letter did not violate the stay because a state statute required the town to send the notice containing a demand for back real estate taxes, and the notice qualified as an exception to the automatic stay under § 362(b)(3).  *Id.* at 11–12. Therefore, the court determined that it could not "conclude that the demand, an essential component of admittedly lawful conduct somehow violated the stay."  *Id.* at 12.  The court also noted that, even if "the tenor of a statutory notice's language could convert lawful action to unlawful," the language of the notice was "not so coercive or harassing as to violate the stay." *Id.* at 13.

The reasoning in *Jennings* is not persuasive here.  First, unlike in *Jennings,* no exception under § 362(b) applies to PNC's conduct.  Second, no state statute required PNC to send the Letters.  PNC claims that a Fannie Mae initiative "requires servicers, including PNC, to actively review seasoned loans, and if qualifying, offer a trial payment plan towards a potential permanent loan modification to reduce the monthly payments," and that it sent the Letters pursuant to this "directive."  ECF No. 7-1 at 10–11.  However, even if Fannie Mae did mandate PNC's sending of information about a loan modification, Fannie Mae's guidelines do not require PNC to mention foreclosure.  *See id.* at 39–70.  In contrast, the statute in *Jennings* required the town to include the demand for back taxes.  The Fannie Mae guidelines for letters and notices

14

also stipulate that "[a]ll communications with borrowers must comply with the requirements of applicable law." *Id.* at 87. Applicable law certainly includes the Bankruptcy Code. Therefore, PNC had sufficient opportunity to customize the Letters to both offer a loan modification *and* comport with the automatic stay.

The *Jennings* court recognized that a "cursory inquiry" to their attorneys or the town would have informed the debtors that the notice's threatening warnings "were standard fare," and that the notice was "but the first step in a long process[.]" 304 B.R. at 13. Unlike the notices in *Jennings*, there was nothing "standard" about sending letters with mentions of foreclosure to a debtor protected by the automatic stay. Finally, the Letters' threats of foreclosure did not represent preliminary steps in a long process. In Colorado, where a foreclosure sale was scheduled prior to the debtor filing for bankruptcy, the scheduled sale date of the property is not dismissed, but rather is postponed from week to week. ECF No. 7-3 at 293–94. Therefore, a debtor's property could be sold quite quickly if foreclosure proceedings were to resume.

In sum, the stay is one of the most fundamental protections offered to debtors by federal bankruptcy laws. The stay entitled Ogden to temporary breathing space in order to relieve her of the financial pressures that drove her to bankruptcy and to afford her the chance to comply with her repayment plan. The Letters disrupted that statutorily-guaranteed respite by brandishing the "Damoclean sword of foreclosure" over Ogden's head. *Jamo*, 283 F.3d at 402. I affirm Judge Brown's conclusion that PNC's conduct violated the automatic stay.

### B. PNC's Violations Were Willful.

"Section 362(k)(1) protects against violations of the stay by providing that 'an individual injured by any willful violation of a stay provided by this section shall recover actual damages,

including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.'" *In re Johnson,* 575 F.3d at 1083 (quoting § 362(k)(1)). A violation is willful if the party knew of the automatic stay and intended to take the actions that violated the stay. *Diviney*, 225 B.R. at 774. Specific intent is not required, so the creditor need not have intended to violate the automatic stay. *Id.* "Once the creditor becomes aware of the filing of the bankruptcy petition and therefore the automatic stay, any intentional act is willful." *Sullivan*, 357 B.R. at 853 (internal quotations and citation omitted).

As mentioned above, the Court must affirm the bankruptcy judge's determination that PNC's violations of the stay were willful unless her conclusion was clearly erroneous. I conclude that Judge Brown's finding was factually supported, and she was correct to conclude that PNC willfully violated the stay. There is no dispute that PNC had actual knowledge of Ogden's filing for bankruptcy. ECF No. 7-3 at 294. In fact, the January Letter directly referenced the bankruptcy proceedings. *Id.* At the bottom of that letter, an addendum read "[w]e understand that you have filed for bankruptcy and have not yet received a discharge. None of the information requested in this letter will be used for . . . purposes prohibited by the Bankruptcy Code [.]" ECF No. 7-1 at 5. Given its knowledge of Ogden's bankruptcy petition, PNC knew that the automatic stay was in place. Furthermore, PNC's decision to send the two letters pursuant to Fannie Mae's new initiative cannot be classified as anything but deliberate conduct.

### C. PNC's Willful Violations Injured Ogden.

In addition to establishing willfulness, the debtor must also demonstrate a cognizable injury in order to be entitled to damages under § 362(k)(1). *See In re Kline,* 2011 WL 3879485, at *4 (Bankr. D.N.M .2011), affirmed, 472 B.R. 98 (BAP 10th Cir. 2012), affirmed, 514 Fed.

Appx. 810 (10th Cir. 2013).  Following the Evidentiary Hearing, Judge Brown concluded that

Ogden did suffer from emotional distress.  ECF No. 7-3 at 296–97.  Judge Brown's

determination is a question of fact, which I review under a clearly erroneous standard.  I have the

responsibility to "accept [Judge Brown's] ultimate factual determination[s]" unless they lack

"minimum evidentiary support displaying some hue of credibility," or they "bear no rational

relationship to the supportive evidentiary data."  *In re Mama D'Angelo, Inc.*, 55 F. 3d 552, 555

(10th Cir. 1995).

　　Other circuit courts have considered emotional distress damages to be actual damages

under § 362(k)(1).  *See, e.g., In re Snowden,* 769 F.3d 651, 656–57 (9th Cir. 2014) (§ 362(k)(1)

permits an award of emotional distress damages if the debtor suffers significant harm, clearly

establishes the significant harm, and demonstrates a causal connection between that significant

harm and the violation of the automatic stay); *Lodge v. Kondaur Capital Corp.,* 750 F.3d 1263,

1271 (11th Cir. 2014) (same); *Fleet Mortg. Group, Inc. v. Kaneb*, 196 F.3d 265, 269 (1st Cir.

1999) (awarding damages because debtor's providing of "specific information about the sharp

decline in social invitations and outings following [mortgage company's] violation of the

automatic stay" constituted sufficient evidence of emotional harm).  However, the Seventh

Circuit restricts the recovery of emotional distress damages to those emotional injuries incidental

to a financial injury.  *Aiello v. Providian Financial Corp.*, 239 F.3d 876, 879–80 (7th Cir. 2001)

(casting doubt on whether Congress intended to include emotional distress damages within §

362(k) as "[t]he Bankruptcy Code was not drafted with reference to the emotional incidents of

bankruptcy[.]").  The Fifth Circuit favorably cited *Aiello* when holding that a debtor has a

minimum obligation of establishing "specific information" regarding a claim for emotional

distress damages and cannot solely rely on "generalized assertions." *In re Repine*, 536 F.3d 512,

521 (5th Cir. 2008) (finding that because the debtor did not provide the requisite specificity, the

Fifth Circuit did not need to reach the issue of whether to follow *Aiello*).

The Tenth Circuit has not adopted an approach to determining whether emotional distress

constitutes an injury for the purposes of actual damages.  However, lower courts in this circuit

have suggested that emotional distress damages are recoverable under § 362(k)(1) if the debtor

can provide specific evidence of a relatively significant injury.  *See In re Gagliardi*, 290 B.R.

808, 819 (Bankr. D. Colo. 2003) (Judge Brown finding that "fleeting and unsubstantiated

emotional distress is not compensable"); *In re Diviney,* 211 B.R. 951, 967 (Bankr. N.D. Okla.

1997), affirmed, 225 B.R. 762 (BAP 10th Cir. 1998) (emotional distress damages denied because

of a lack of evidence).  Furthermore, in order to recover actual damages for emotional distress,

the debtor's injury must be somewhat connected to the violations, as the automatic stay does "not

shield the debtor from all the vicissitudes, aggravations and anxiety of everyday life." *Sullivan*,

357 B.R. at 854.  Additionally, in a previous opinion, Judge Brown noted that §362(k)(1)

"presumes a causal connection between the injury and the stay violation." *In re Trujillo*, 485

B.R. 238, 254 (Bankr. D. Colo. 2012).

Accordingly, I conclude that, in order to affirm Judge Brown's award of emotional

distress damages, there must be specific evidence of Ogden's emotional distress and a causal

connection between the alleged injury and PNC's willful violation of the stay.  Following my

review, I find that Judge Brown's determinations were not clearly erroneous.

PNC argues that this Court should vacate Judge Brown's award of actual damages

because Ogden has not clearly established that she suffered emotional distress or that the Letters

caused any injury that she may have sustained.  ECF No. 14 at 23–35.  Specifically, PNC argues that Judge Brown erred in awarding actual damages because she did not find evidence of emotional distress caused by the Letters during the Adversary Proceeding.  *Id.* at 9.  Judge Brown explains that she did not find emotional distress the first time in part because she has a general aversion to "awarding emotional distress damages without corroborating medical testimony or other evidence."  ECF No. 7-3 at 296; *Gagliardi*, 290 B.R. at 819 (in the absence of any evidence to corroborate the debtor's injuries, Judge Brown could not find that the alleged emotional distress was attributable to the willful stay violations).  She further explained that in most cases "the testimony of the debtor at best describes fleeting emotional distress and the level of distress bears little relationship to the nature of the violation."  *Id.*  However, when she revisited this case during the Evidentiary Hearing, she was able to "reconsider this aspect" of her first order.  *Id.*

Upon her reexamination, which included taking into account the parties' arguments at the Evidentiary Hearing and new exhibits, Judge Brown found Ogden's testimony about her emotional distress to be "very compelling" and "very credible."  *Id.* at 293, 296.  The bankruptcy court stated that Ogden's "testimony demonstrated significant emotional distress" related to the threats of foreclosure.  *Id.* at 290.  Ogden testified that she felt "enormous" stress and fear, and that after receiving the Letters, "she flew into a panic."  *Id.* at 293.  She claimed that PNC sent agents to her home to take "inspection" photographs.  *Id.*  She began to seek refuge in her bedroom to avoid being photographed.  *Id.*  As the months went on, and she did not receive any information from PNC about why she had received the Letters, "she began losing weight as she was having great difficulty eating and sleeping.  By March 2013, her hair was falling out in

clumps.  She was grinding her teeth when she was able to sleep."  *Id.*  Ogden explained that she

had not visited a doctor or therapist because she could not afford to do so as she did not have

health insurance.  *Id.*

Regarding causation, Ogden identified that it was the fear of foreclosure that caused her

so much anxiety.  *Id.*  As mentioned above, a foreclosure sale that is scheduled pre-petition is not

dismissed upon the debtor's filing for bankruptcy, but rather is postponed from week to week.

*Id.* at 293–94.  As Judge Brown indicated, this dynamic means that PNC "was in a position to

proceed very quickly to complete the sale.  Faced with this dilemma, any reasonable person

would have felt powerless, fearful, and victimized."  *Id.* at 294.  Judge Brown determined that

Ogden, as a paralegal, is "no stranger to the litigation process[,]" and that "[s]he testified

credibly that neither the litigation nor any other events contributed to her stress.  It was the fear

that the Bank was going to foreclose again [that caused her distress]."[7]  *Id.* at 293.

Furthermore, PNC had previously initiated an improper foreclosure, and it did not

acknowledge these mistakes until after Ogden filed her bankruptcy petition.  And "six months

after [Ogden] confirmed her chapter 13 plan to cure legitimate past due amounts, the Bank

started once again to issue letters that . . . threatened continuation of the pending foreclosure

proceedings."  *Id.*  Therefore, Judge Brown explained that Ogden's past experiences with PNC

---

[7] PNC argues that "property inspections have no relation to the November or January Letters.  Property inspections are conducted pursuant to the agreed upon terms of the Deed of Trust and do not violate the automatic stay."  ECF No. 14 at 35 n.9.  Additionally, PNC notes that Ogden "testified that she was not aware of the property inspections until August 20, 2013 – 8 months after receiving the January Letter and only a month before the trial in the Adversary Proceeding."  *Id.*  PNC's argument is unconvincing.  In the months after sending the Letters, PNC did not provide Ogden with any reassurance that she was not going to lose her home.  Therefore, the fact that Ogden did not know about the inspections until August 2013 does not erode the reality that the threatening nature of the Letters caused her to worry about the inspections.  Ogden reasonably believed that the inspections occurred because PNC was getting ready to foreclose on her home.

gave her "[e]very reason to believe the Bank's threats of foreclosure in these post-petition letters, despite the fact that she had a court order binding the Bank to her plan of reorganization." *Id.* Judge Brown recognized that, after receiving the Letters, Ogden spent a considerable amount of time having to "suffer the uncertainty of whether the Bank was going to foreclose on her home on one week's notice[.]" *Id.* at 296–97. The bankruptcy court concluded that this tenuous dynamic "would cause any reasonable person to undergo enormous stress, which would be highly likely to result in some negative effect on her physical wellbeing." *Id.* at 297.

I find no clear error in Judge Brown's factual findings regarding the injuries to Ogden's emotional wellbeing caused by PNC's letters. Judge Brown's changing of her mind regarding Ogden's emotional distress does not rise to the level of reversible error. Her explanation for her shift in course reflects reasonable judgment, and her ultimate findings do bear a rational relationship to the evidence presented. Therefore, I affirm Judge Brown's conclusion that Ogden suffered significant emotional distress as a result of PNC's violations of the stay.

### D.  No Abuse of Discretion in Awarding Damages.

The Bank argues that even if the Letters constituted willful violations of the stay, Judge Brown erred in awarding emotional distress damages, attorney's fees, and punitive damages. I review the bankruptcy judge's award of damages under an abuse of discretion standard. Under this standard, I must give deference to the bankruptcy court "because of its first-hand ability to view the witness or evidence and assess credibility and probative value." *Scroggin*, 364 B.R. at778 (internal quotations and citation omitted).

### 1. Actual Damages for Emotional Distress.

I find no abuse of discretion in Judge Brown's award of $10,000 in actual damages. Judge Brown did confess that this number is "admittedly a very arbitrary figure." ECF No. 7-3 at 297. However, she was referring to the difficulty in arriving at a dollar figure when there is "nothing concrete on which to base the award." *Id.* Ogden had requested $25,000 to compensate for her emotional distress. *Id.* Judge Brown did her best to determine the proper dollar amount when taking into account that Ogden's emotional "suffering was very real and very prolonged." *Id.* Following my review, I find no reason to believe that her award was "arbitrary" for purposes of the abuse of discretion standard. Therefore, I affirm her award of $10,000 in actual damages.

### 2. Attorney's Fees.

PNC argues that the bankruptcy court erred in awarding attorney's fees to Ogden. ECF No. 14 at 35. Defendant states that "[b]ecause [Ogden] cannot show that she was injured by the alleged stay violation and because the fees awarded were not caused by [Ogden's] receipt of the Letters, the Court should reverse this award." *Id.* This Court's finding that PNC did injure Ogden moots the bank's argument that attorney's fees should not be awarded because Ogden cannot show injury and causation. *See also Gagliardi,* 290 B.R. at 820 (rejecting the notion that attorney's fees cannot be awarded without proof of other injury and interpreting the language of § 362(k) to mean that Congress "considered fees as an example of actual damages by itself.").

PNC asserts that the Adversary Hearing was focused solely on the Bank's accounting practices and, therefore, attorney's fees from that proceeding should not be awarded as damages

attributable to the Letters.  *Id.* at 30.  PNC claims that "the November and January Letters were nothing more than passing references in the Adversary Proceeding."  *Id.* at 31.  The bank also argues that these attorney's fees should not have been awarded because "PNC fully prevailed in the adversary proceeding, and further that the debtor did not assert a claim in the adversary proceeding for alleged violation of the automatic stay based on the November and January Letters."  *Id.* at 9.

In contrast, Judge Brown explained that the attorney's fees were incurred to prosecute the Adversary Proceeding, and that "a significant portion of the first trial was related to the letters." ECF No. 7-3 at 297.  Furthermore, Judge Brown attested that the "testimony regarding the Bank's accounting practices was also relevant to the letters because it was the Bank's choice to maintain two sets of records, with no safeguards to prevent foreclosure letters issuing from the 'contractual' records, which caused these violations."  *Id.*  Put another way, Judge Brown concluded that the trial on PNC's accounting processes cannot be separated from the issue of whether the Letters violated the stay because the manner in which PNC maintained its records resulted in the issuance of the Letters themselves.

In reviewing the record below, this Court notes that Ogden did argue that the January Letter violated the stay during her written closing argument as part of the Adversary Hearing. *See* ECF No. 7-5 at 283.  Furthermore, Judge Brown's order following the Adversary Hearing suggested that she could have found that PNC gave implied consent to try the issue of whether the January Letter violated the stay.  *Id.* at 284–86.  However, as discussed above, Judge Brown took a cautionary approach and vacated the section of her order that addressed the January Letter and awarded damages to Ogden.  *Id.* at 286.  The bank oversimplifies the procedural history

when it claims that it prevailed on all claims in the Adversary Hearing, and that the automatic

stay was not at issue.

Judge Brown also concluded that the attorney's time entries were sufficiently detailed to

permit her to determine whether the fees related to the Letters.  *Id.*  Regarding the amount of fees

and costs, Judge Brown acknowledged that they were higher than normal for a stay violation

hearing.  However, she explained that PNC's "lack of cooperation, its obstruction of the

discovery process, and its frivolous defenses" explained why Ogden accrued higher-than-normal

fees.  *Id.* at 298.

PNC also argues that Ogden has not established that she is responsible for paying fees

because she has not provided a copy of any fee arrangement.  ECF No. 14 at 40.  As Ogden

notes, Judge Brown permitted PNC to request an evidentiary hearing on the attorney's fees, but

PNC never exercised this option.  ECF Nos. 15 at 22; 7-3 at 297.

Following my review of the award of attorney's fees and costs, I find that Judge Brown

did not abuse her discretion in determining that Ogden is entitled to attorney's fees.  Similarly, I

conclude that Judge Brown did not abuse her discretion in calculating the amount of attorney's

fees and costs to be awarded.  I affirm her award of $24,404.57.

### 3.  Punitive Damages.

Judge Brown also awarded punitive damages in the amount of $35,000.  ECF No. 7-3 at

299.  While it provides for the recovery of punitive damages, § 362(k)(1) does not outline how to

determine whether "appropriate circumstances" exist for the award of punitive damages.  The

Tenth Circuit has held that punitive damages are appropriate "if the violation is willful or in

reckless disregard of the law[.]"  *Culley*, 2006 WL 2091199, at *4.  As Judge Brown notes,

bankruptcy courts in the Tenth Circuit also employ five factors when considering an award of punitive damages: "(1) the nature of the creditor's conduct; (2) the creditor's ability to pay damages; (3) the level of sophistication of the creditor; (4) the creditor's motives; and (5) any provocation by the debtor." ECF No. 7-3 at 299; *Gagliardi*, 290 B.R. at 820 (internal citation omitted). "The primary purposes of an award of punitive damages are punishment and deterrence." *Id. See also State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003) (punitive damages do not serve to remedy a debtor's losses, but "are aimed at deterrence and retribution.").

PNC argues that there is "nothing egregious or malicious" about the nature of its conduct in sending the Letters. ECF No. 14 at 42. Rather, PNC characterizes the Letters as a benevolent "attempt to reduce [Ogden's] monthly payments." *Id.* It further attests that it notified Ogden's attorney of the offer of a loan modification, and that it never sought to collect a pre-petition debt outside of the bankruptcy proceedings nor did it "commence or resume any foreclosure action against the property." *Id.* PNC acknowledges that it has "admitted to sending the Letters," but it denies raising any frivolous defenses. *Id.* at 43, 44.

In contrast, Judge Brown found the nature of PNC's conduct to be reckless. ECF No. 7-3 at 298. She concluded that PNC's conduct is "not as egregious as some stay violation matters that [she] has presided over," but that PNC did act recklessly by not erecting "sufficient safeguards" to prevent the issuance of the form letters. *Id.* Specifically, the bankruptcy court took issue with the fact that PNC "made no attempt" to institute any screening for bankruptcy filings when it ran a search for all loans that might qualify for a loan modification before sending

form letters with payment terms and "foreclosure avoidance language." *Id.* Judge Brown contended that this "recklessness" could injure other debtors like Ogden. *Id.*

Furthermore, Judge Brown determined that PNC is a sophisticated creditor, and it "is well aware of the automatic stay and the actions that it prohibits." *Id.* Additionally, regarding PNC's motives, Judge Brown claimed that "Ms. Thomas' testimony and the actions of the Bank have so exacerbated matters in this proceeding that it has caused [Judge Brown] to form the impression that the Bank bears actual ill will towards [Ogden]." *Id.* The bankruptcy court concluded that PNC's refusal to "quickly and easily" reassure Ogden that "the letters had been sent in error" reflects a general attitude of resistance to helping Ogden in "any way." *Id.* at 299. Judge Brown indicated that, had PNC demonstrated any interest in communicating with or assisting Ogden, it could have avoided the Adversary Proceeding "before the parties had incurred significant attorney fees and costs." *Id.* The bankruptcy court described PNC as sending the signal that "it believes it is above reproach." *Id.* Judge Brown also determined that Ogden did not do anything to provoke this treatment. *Id.* Finally, the bankruptcy court found that PNC raised a number of frivolous defenses, which "further justifies the imposition of punitive damages." *Id.*

This Court "must accord broad discretion to the [bankruptcy] court's determination [regarding punitive damages] because it has had the benefit of hearing the testimony, of observing the demeanor of witnesses and also knows the community and its standards." *Jordan-Starr v. Norwest Bank-Region VIII*, 163 B.R. 838, 840 (D. Colo. 1994) (internal quotations and citations omitted). Following my review, I cannot conclude that Judge Brown abused her

discretion by making a clear error of judgment or exceeding the bounds of permissible choice when determining that Ogden is entitled to punitive damages under these circumstances.

I find no abuse of discretion in Judge Brown's arrival at the sum of $35,000. Judge Brown explained that she arrived at this number because Ogden introduced evidence regarding PNC's financial situation at the Evidentiary Hearing, and she was under an obligation to serve the goal of deterrence by setting the amount high enough to actually change the creditor's behavior. *Id.* at 299. Given that PNC's financial statement reflected a net worth of over $89 million and more than $316 million in assets, Judge Brown properly concluded that "it would take a significant award to deter this creditor." *Id.*

PNC also claims that the award of punitive damages is excessive from a constitutional standpoint. PNC does not explicitly claim that an award of $35,000 violates its due process rights under the Fifth Amendment, but it does claim that the amount should be reduced based on due process implications. ECF No. 14 at 10, 44–46. As mentioned above, while I review the award of punitive damages for an abuse of discretion, I must consider its constitutionality de novo.

"[I]t is well established that there are procedural and substantive constitutional limitations on [punitive damage] awards[,]" and that due process "prohibits the imposition of grossly excessive or arbitrary punishments[.]" *State Farm*, 538 U.S. at 416 (internal citations omitted). "In analyzing the constitutionality of punitive damages, the Supreme Court has instructed courts to look to (1) the degree of reprehensibility of the defendant's action; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damage award; and (3) the

difference between the punitive damage award and the civil penalties authorized or imposed in comparable cases." *Culley*, 2006 WL 2091199, at *5 (internal citation omitted).

As PNC notes, regarding the ratio of "actual or compensatory damages to punitive damages, the Supreme Court has recently held that 'in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process.'" ECF No. 14 at 38 (quoting *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 436 (2001)). However, following guidance from the Supreme Court, the Tenth Circuit has rejected a categorical approach to punitive damages in that there is no simple mathematical formula for computing a punitive award by comparing it to the actual or potential damages. *Haberman v. The Hartford Insurance Group*, 443 F.3d 1257, 1272 (10th Cir. 2006) ("there are no rigid benchmarks that a punitive damages award may not surpass"). "[L]ow awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine." *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 582 (1996).

PNC urges this Court to reduce the punitive damages award should it vacate or reduce the award of actual damages and attorney's fees. Because I affirm Judge Brown's decisions on actual damages and attorney's fees, her award of punitive damages is roughly the same amount as the compensatory damages. Additionally, I find no abuse of discretion in her conclusion that the nature of PNC's conduct was highly reprehensible. In sum, I conclude that Judge Brown's

award of punitive damages was not an abuse of the bankruptcy court's discretion, it does not run

afoul of constitutional limits, and it should be affirmed.

### E.  Res Judicata is Inapplicable.

PNC also argues that the doctrine of res judicata should have barred the bankruptcy

court's consideration of Ogden's claim that the Letters violated the stay under the Order to Show

Cause.  ECF No. 14 at 46.  "The doctrine of res judicata, or claim preclusion, will prevent a party

from relitigating a legal claim that was or could have been the subject of a previously issued final

judgment." *MACTEC, Inc. v. Gorelick*, 427 F.3d 821, 831 (10th Cir. 2005) (internal citation

omitted).  "Under Tenth Circuit law, claim preclusion applies when three elements exist: (1) a

final judgment on the merits in an earlier action; (2) identity of the parties in the two suits; and

(3) identity of the cause of action in both suits." *Id.*  (internal citation omitted).

PNC attests that "[t]he first two "parties are identical and the bankruptcy court's amended

order in the adversary proceeding was a final judgment on the merits[.]" *Id.* at 47.  PNC also

argues that "the Letters arose from the same nucleus of facts as the claims in the Adversary

Proceeding." *Id.* at 49.  Therefore, PNC concludes that res judicata should have precluded the

bankruptcy court's consideration of Ogden's claim raised under the Order to Show Cause." *Id.*

at 47.

This argument is without merit.  Judge Brown dismissed Ogden's claims that PNC had

violated the stay without prejudice.  *See* ECF No. 7-3 at 290.  "Generally, a dismissal without

prejudice does not operate as a final adjudication on the merits and has no claim-preclusive

effect on a later suit." *McNally v. Colorado State Patrol,* 2004 WL 2445576, at *3 (10th Cir.

2004) (unpublished) (internal citation omitted).  *See also* 18 James Wm. Moore, et al., Moore's

Federal Practice, § 131.54[1] (3d ed.1997) ("A dismissal of an action *without prejudice* is an indication that the judgment is not on the merits and will therefore have no preclusive effect.") (emphasis in original).  Judge Brown's dismissal of Ogden's stay violation claims had no preclusive effect of her consideration of the claims presented in the Evidentiary Hearing.

## ORDER

For the reasons described above, Judge Brown's order is affirmed.  Ogden is entitled to the damages and fees as awarded by the bankruptcy court for PNC's willful violation of the automatic stay.

DATED this 18th day of March, 2016.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge